## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**FRANCISCO COSSIO,**

        **Petitioner,**

**V.**                                        **Case No:  2:11-cv-471-FtM-29SPC**

**USA,**

        **Respondent.**

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This matter comes before the Court on the Petitioner, Francisco Cossio's Petition Under 28 U.S.C. § 2255 (Doc. # 1) filed on August 24, 2011.  The Respondent United States of America (Government) filed its Response in Opposition (Doc. # 27) on May 7, 2012. The matter was referred by the District Court to this Court for a Report and Recommendation (Doc. # 4) on November 8, 2011.  The Petitioner, with leave from the Court, filed an Amended § 2255 Petition (Doc. #24) on July 18, 2012.  The Petitioner incorporated his earlier Petition (Doc. # 1) into his Amended Petition.  The Respondent filed its Amended Response in Opposition (Doc. # 27) on August 7, 2012.  Likewise, the Government incorporated its initial Response in Opposition (Doc. # 14) filed on May 7, 2012, into its Amended Response in Opposition.

      The hearing on the Petitioner's Petition was originally scheduled for June 14, 2012.  Upon Motions filed by both Parties, the hearing was moved to July 12, 2012.  On July 6, 2012, the Petitioner's Counsel moved the Court to continue the hearing in order for Counsel to prepare and file an Amended Petition.  The hearing was continued until August 9, 2012.

A hearing on the Petition to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 was held on August 9, 2012, before the undersigned Magistrate Judge.  The Petitioner testified on his own behalf.  The Government called Attorney Alan Kaufman, to testify and submitted the Petitioner's signed waiver of appeal (Gov't. Ex. 1), and Atty. Kaufman's "cheat sheet"/questionnaire (Gov't. Ex. 2).

## TESTIMONY AND EVIDENCE

**Francisco Cossio**:

The Petitioner was originally arrested on drug related charges. (Tr. 6:12-16).   The Petitioner was initially represented by counsel from the Federal Public Defenders Office who withdrew from the case due to a conflict of interest. (Tr. 7:2-9).   After the Public Defenders Office withdrew from the case, Attorney Alan Kaufman (Atty. Kaufman) from the Criminal Justice Act panel was appointed to represent the Petitioner. (Tr. 7:10-12; 56:5-6).

The Petitioner states that he met with Atty. Kaufman on three different occasions, twice at Moore Haven correctional and once at Lee County Jail. (Tr. 7:21-22).  At the first meeting in Moore Haven, the Petitioner and Atty. Kaufman discussed the charges against him and his potential sentence.  (Tr. 8:2-9).  The Petitioner informed Atty. Kaufman that he had heard that he could get as much as forty (40) years to life when he was in court. (Tr. 8:4-5).  The Petitioner testified that Atty. Kaufman believed he would receive no more than three (3) years for the charges against him. (Tr. 8:7-8).

The Petitioner stated that he did not receive any discovery at the initial meeting but did receive it some seven (7) months later. (Tr. 8:14-20).  He testified that he could not remember if Atty. Kaufman actually brought the discovery to him or if he sent it to him. (Tr. 8:23-9:2).

At the second meeting, the Petitioner states he and Atty. Kaufman talked about his wife's case. (Tr. 9:8-10). Atty. Kaufman told the Petitioner that if he would plead guilty to his charges that his wife would get the best deal. (Tr. 9:12-17). The Petitioner said that he believed he had a good defense against the criminal charges but stated he would plead guilty to help his wife with her case. (Tr. 9:22-10:8). The Petitioner said that he abandoned his defenses in his case because Atty. Kaufman told him that he could help his wife out by pleading guilty. (Tr. 9:9-12). On cross examination, the Petitioner stated that he had defenses to the Government's claims against him but he never explained to Atty. Kaufman the nature of those defenses. (Tr. 43:10-21). At one point in his testimony, the Petitioner admitted that he committed the crimes that he was charged with and then followed that his defense to the crimes was that he did not do the things he was charged with. (Tr. 33:10-20).

The Petitioner said he made contact with Atty. Kaufman advising him that he was in Lee County Jail and arranged a third meeting. (Tr. 10:18-22). At the third meeting, the Petitioner states that Atty. Kaufman brought him some papers (Plea Agreement) to review. (Tr. 10:21-22). Atty. Kaufman asked the Petitioner to review the Plea Agreement, initial the pages, and then sign at the end.[1] (Tr. 11:11-13). Atty. Kaufman said he would return the next day and pick up the Plea Agreement. (Tr. 11:11-13). The Petitioner testified that he did not understand what the Plea Agreement was but did know what it would do for him. (Tr. 11:14-17).

The Petitioner testified that Atty. Kaufman never went through the Plea Agreement with him but just dropped the papers off and said he would pick them up the next day without explaining what they meant. (Tr. 12:3-14). The Petitioner said Atty. Kaufman told him they would be going to trial on Monday which was the next morning. (Tr. 12:20-21). Instead, he said you sign the papers and we will go Monday and that will be it. (Tr.12:21-23; 37:12-15). He

---

[1] The Court takes note of the Plea Agreement, Case No. USA v. Cossio, 2:09-cr-90 (Doc. # 128).

3

stated that Atty. Kaufman was his lawyer and he trusted him, so he did not ask what the Plea Agreement meant. (Tr. 12:17-18; 36:16-17). Atty. Kaufman had already told him he would get a sentence of five (5) years. (Tr. 12:17-18).

According to the Petitioner, Atty. Kaufman never discussed his immigration status with him. (Tr. 13:13-19). He testified that no one explained the immigration consequences to him that would result from his entering a guilty plea. (Tr. 14:7-12, 19-22). He inquired of Judge Steele at his sentencing about his immigration status, but Judge Steele told him he would have to see an Immigration Judge. (Tr. 17:21-18:5). He further testified that at no time did Atty. Kaufman, cover the potential immigration consequences with him. (Tr. 18:6-9). The Petitioner's Counsel asked the Petitioner "[a]nd at no time did he [Kaufman] tell you that you were subject to deportation and that what you were pleading to was a deportable offense; is that correct?" (Tr. 18:10-12). The Petitioner responded "Yes Sir." (Tr. 18:13). The Petitioner further stated that when he pled before the Magistrate Judge no one mentioned any immigration issues. (Tr. 18:17-19). The Petitioner further stated that he cannot remember seeing any mention in the Magistrate's Report and Recommendation regarding his immigration status. (Tr. 18:20-24).

The Petitioner also testified that at his plea hearing he initialed every page of the Plea Agreement and signed at the end. (Tr. 36:8-9; 37:18-20). He acknowledged that the Plea Agreement contained a factual summary of the facts of his case and that he agreed to the ten (10) page factual summary read by the Magistrate Judge during his plea. (Tr. 38:9-17). He admitted that he initialed each of the ten (10) pages contained in the factual summary and that he told the Magistrate Judge at the hearing that he agreed with the facts in the Plea Agreement. (Tr. 39:1-10). However, he testified at the hearing that he really did not understand the Plea Agreement or what the facts were or consequences of signing the plea. (Tr. 38:18-25; 39:6-9). He admitted he

did not tell the Court that he disagreed with any of the facts in the Plea Agreement. (Tr. 39:6-9). However, he says he does not remember being sworn to tell the truth when he entered his plea before the Court. (Tr. 39:16-20).

When the Petitioner was shown a copy of the Plea Agreement at the hearing, he agreed that it was his signature at the end. (Tr. 39:24-40:2). However, even though the Plea Agreement was also signed by Atty. Kaufman, the Petitioner stated that Atty. Kaufman did not sign it in his presence. (Tr. 40:5-11). The Petitioner said that he did not tell his attorney about any disagreements with the factual basis at the time. (Tr. 40:19-21). He said they had talked about the Plea Agreement and any differences he had at that time and that he talked about "some stuff" that he didn't like but was told by Atty. Kaufman there was nothing he could do. (Tr. 40:21-25). He never communicated with Atty. Kaufman between his plea hearing and his sentencing about his disagreements. (Tr. 41:10-22).

After his plea was entered, the Petitioner met with a probation officer over a T.V. link. Atty. Kaufman was not present when the interview took place. (Tr.15:6-7, 18-23). The probation officer prepared a presentence report (PSR). (Tr. 16:3-4). The Petitioner stated that he received a copy of the PSR but that Atty. Kaufman did not go over the PSR with him or explain what was contained in the PSR. (Tr. 16:5-22).

The Petitioner testified that he understood when Judge Steele told him he had the right to appeal. (Tr. 19:15-18). He further stated that he informed Atty. Kaufman that he wanted to file an appeal. (Tr. 20:20-21:2). He stated that they promised him that his wife would not be prosecuted and sentenced if he would plead guilty, but she was still prosecuted even though he pled guilty. (Tr. 19:19-20:2). He said when he told Atty. Kaufman that he wanted to appeal his sentence, Atty. Kaufman agreed. (Tr. 21:3-7). Petitioner said it was his understanding that Atty.

Kaufman would file his appeal for him. (Tr. 21:22-24).  On cross examination, the Defendant stated that he thought he had grounds for appeal. (Tr. 32:13-17; 34:15-19).   When asked what those grounds for appeal were he stated it was the immigration issue. (Tr. 35:17-24).

The Petitioner testified that after he was sentenced, Atty. Kaufman had him sign a blank piece of paper. (Tr. 21:5-7).  The Petitioner stated that he thought the paper had something to do with filing his appeal. (Tr. 21:5-7).  The Petitioner said he and members of his family tried to get in touch with Atty. Kaufman after he went to prison but Atty. Kaufman never answered any of their letters or returned any of their phone calls. (Tr. 22:5-21).   While the Petitioner acknowledged that he remembered Judge Steele telling him he only had ten (10) days to file his appeal, it was at least five (5) or six (6) months after his sentencing before he tried to contact Atty. Kaufman. (Tr. 42:23-43:3).  He stated that he waited that long to attempt to contact Atty. Kaufman because he thought Atty. Kaufman had filed his appeal and he wanted to check on the appeal's progress. (Tr. 43:15-21).

The Petitioner testified on cross examination that he filed the § 2255 Petition on his own without any help from other prisoners. (Tr. 28:1-5).  He claims that he discovered the statue containing § 2255 while he was reading law books in the prison library and then typed his own Petition and filed it with the Court. (Tr. 29:22-30:2).   However, he did testify that he talked to the "law library guy" in prison about filing a § 2255 Petition.  (Tr. 44:2-10). The "law library guy" told him he needed to file it as soon as possible because his time for filing was about to expire. (Tr. 44:10-12).

The Petitioner said that he thought Atty. Kaufman had done a good job in representing him. (Tr. 50:5-8).  He stated at the time he initialed the pages of the Plea Agreement he believed Atty. Kaufman was doing a good job. (Tr. 49:15-18).  He testified that he had no legal training so

based upon what he knew at the time he felt the plea was the right thing to do but he did not personally know. (Tr. 49:19-50:8).  He stated that at the time he did not know that Atty. Kaufman had a duty to tell him that the offense he was charged with was a deportable offense. (Tr. 50:12-22).  Had he understood the consequences of entering the plea the Petitioner said he would not have agreed to enter a plea. (Tr. 51:2-15).

The Petitioner stated that he was born in Mexico and came to the United States of America when he was eleven (11) years old. (Tr. 22:25-23:5).  He attended school in this country and does not consider himself to be in the United States illegally (Tr. 24:1-6). In the past he has been charged with several crimes including stealing an automobile and domestic violence. (Tr. 24:11-15). At no time during the past incidents was he ever told he would be deported. (Tr. 24:19-25).  The Petitioner said that he would not have pled guilty to the charges if he knew he would be deported. (Tr. 25:5-13).

**Alan Kaufman, Esq.:**

Atty. Kaufman has been an attorney for almost thirty (30) years practicing primarily in the field of criminal defense. (Tr. 56:13-16).  He currently practices only criminal law with the majority of his practice in the Southern District. (Tr. 55:23-25; 94:15-17).  He was appointed to represent the Petitioner Cossio under the Criminal Justice Act (CJA). (Tr. 56:4-6). Atty. Kaufman represented the Petitioner through his plea and sentencing. (Tr. 56:7-10).  Atty. Kaufman made notes for the hearing. (Tr. 56:17-20).  The notes used at the instant hearing were not made contemporaneously with the events but several weeks ago in preparation for the hearing.  (Tr. 57:6-14).  According to his notes based upon his CJA pay vouchers he met with the Petitioner a total of ten (10) times. (Tr. 57:18-20).

The first time Atty. Kaufman met with the Petitioner was on October 9, 2010, at the Lee County Jail.  (Tr. 58:4-8).  At that time, Atty. Kaufman introduced himself to the Petitioner and explained the criminal justice system and what the Petitioner could expect from the process. (Tr. 58:9-21).

Atty. Kaufman testified that at the first meeting he specifically discussed with the Petitioner his legal status in the United States. (Tr. 58:25-59:7).  The Petitioner informed Atty. Kaufman that he was in the country legally, that he had a green card since 1978 and was a legal alien.   (Tr. 59:8-20).   Atty. Kaufman stated that he always asks the legal status of his clients because the issue always comes up at the bond hearings and that you also need the legal status for sentencing as well.[2] (Tr. 60:22-61:6).

Atty. Kaufman also met with the Petitioner on January 14, 2010. (Tr. 61:7-17).  At that meeting, Atty. Kaufman discussed with the Petitioner that he had an immigration hold on him. (Tr. 61:18).  Atty. Kaufman said that he was aware of the Petitioner's difficulties. (Tr.61:19-21).  Atty. Kaufman stated that he covered the Petitioner's immigration status and the problems his status would create for him if he pled guilty to the charges against him. (Tr. 61:22-62:1).  Atty. Kaufman continued that the Petitioner was well aware of how the immigration process worked because his wife was also arrested with him and faced immigration issues. (Tr. 62:5-14).  Atty. Kaufman said the Petitioner was very despondent because of his wife's situation and expressed a lot of concern about her legal status in the United States. (Tr. 62:8-22).

Atty. Kaufman continued that the Petitioner's concerns were based upon his fear that his wife would be deported back to Mexico and that his children would not have their mother around to care for them if he went to jail. (Tr. 62:17-22).  Atty. Kaufman said that he was aware of the

---

[2] On cross exam Atty. Kaufman acknowledged that the Federal Public Defenders Office represented the Petitioner at his bond hearing. (Tr.).

Petitioner's wife's legal status in the United States and even contacted her attorney to discuss what her plea would be and how much time she might receive. (Tr. 62:23-63:13).   He also conveyed to the Petitioner what the potential impact his wife's plea might have on her deportation status. (Tr. 63:14-17).

According to Atty. Kaufman, he and the Petitioner also discussed whether or not he had any defenses to the charges against him. (Tr. 63:18-64:2).   Atty. Kaufman said the first couple of times they talked the Petitioner stated there were some issues related to a car that was stopped coming from Mexico with drugs found inside. (Tr. 64:3-12).   Those drugs were attributed to the Petitioner. (Tr. 64:7-12).   The Petitioner was adamant that he didn't know anything about the drugs. (Tr. 64;7-12).    The Petitioner said he did not have a problem with pleading guilty to selling drugs from his house, or at his house. (Tr. 65:4-10).   However, just before the plea hearing, Atty. Kaufman again covered the cocaine found hidden in the car. (Tr.65:11-14).   Atty. Kaufman told the Petitioner that he would have to acknowledge the facts in the Plea Agreement including the cocaine in the car from Mexico and agree to those facts when the Court asked about them at the change of plea hearing.  (Tr. 65:11-15).   The Petitioner said he understood and had no problem with those facts. (Tr. 65:15-16).

Atty. Kaufman said he discussed the provisions in the Plea Agreement with the Petitioner in detail. (Tr. 66:4-5).   He said the Petitioner may not have understood all of the provisions in the Plea Agreement when he first started reviewing it but he "absolutely understood every provision because he spent a lot of time with him." (Tr. 66:14-18).   Atty. Kaufman signed the Plea Agreement and then had the Petitioner sign it as well. (Tr. 66:11-25).    The Petitioner reviewed every single one of the ten (10) pages of facts contained in the Plea Agreement. (Tr. 67:5-15).   Atty. Kaufman informed the Petitioner if he did not agree with the facts in the Plea Agreement

he needed to state why now because the Judge would not allow him to plead guilty if he did not agree with every detail. (Tr. 65:12-15).   He testified that he was present when the Petitioner signed the agreement.  (Tr. 66:11-13). Atty. Kaufman said that he specifically remembered the Petitioner signing the Plea Agreement because he used his pen to sign. (Tr. 66:13).

Atty. Kaufman said that he used a "cheat sheet" or questionnaire to make sure that he covered every detail and consequence that would result from the Petitioner entering a guilty plea. (Tr. 68:2-18); (Gov't. Ex. 1).   Atty. Kaufman affirmed that he specifically covered the immigration consequences of the plea as well. (Tr. 68:13-18).  He testified

> I advised Mr. Cossio, [the Plea] says deportation, and I advised him that there is a possibility --I don't know, I'm not an immigration lawyer. I have no idea if it's going to happen in your case, but there is a possibility you could be deported as a result of having a felony conviction.

(Tr. 68:13-18)   In addition, the "cheat sheet" covered other consequences of a plea of guilty such as the possibility he could lose the right to vote, the results of a mandatory minimum sentence, the nature and information include in a Presentence Investigation Report (PSI), and that the Court was not bound by the Plea Agreement even though he signed it. (Tr. 68:24-69:24). Atty. Kaufman continued that the Judge would ask him about any mental illnesses he might have or if he was under the influence of alcohol or any other drugs before entering his plea. (Tr. 69:22-70:2).   He also told the Petitioner that he would give up any defenses to the charges against him by signing the Plea Agreement.  (Tr. 70:14-15).   Atty. Kaufman did say on cross examination that he did not check off each item on his "cheat sheet" as he discussed it with the Petitioner, but instead used the "cheat sheet" as a guide to ensure that each topic was discussed with the client. (Tr. 90:14-91:16; 92:20-25).

Atty. Kaufman testified that he also covered the PSI in detail with the Petitioner. (Tr. 100:22-23).  He testified that the PSI contained language that informed the Petitioner that there

was more than a possibility that he would be deported to Mexico. (Tr. 101:2-5).  Atty. Kaufman testified that "in the PSI, it's absolutely clear that he was informed that there was more than a possibility, that he had a detainer and he was going to be deported." (Tr. 102:7-10).  Atty. Kaufman said that although it did not specifically state that the Petitioner would absolutely be deported, he did tell the Petitioner that he had a great possibility of being deported. (Tr. 102:11-19).  He said the best way to fight the deportation would be to hire an immigration attorney to challenge the status because no matter what the statute said about deportation after a drug felony, he had seen people stay in the United States. (Tr. 101:19-102:4).

Regarding the deportation consequences of the plea, Atty. Kaufman stated the Petitioner informed him that he was in the United States legally and that he had a green card. (Tr. 71:24-72:1). He explained again how he came to live in the United States with his parents when he was eleven (11) years old. (Tr. 71:25-72:1).  Atty. Kaufman told the Petitioner that he had a deportation detainer against him and that there was the possibility he could be deported. (Tr. 72:1-6).  He said "I can't tell you you will, I can't tell you you won't. But you do have a detainer and it's a possibility." (Tr. 72:4-6).

In addition to the deportation issues, Atty. Kaufman also discussed the fact the Petitioner would waive his rights to file an appeal by entering into the Plea Agreement. (Tr. 72:16-19).  In fact, Atty. Kaufman stated that he spent a lot of time explaining to the Petitioner the fact that he would give up his right to appeal. (Tr. 72:22-73:7).  He told the Petitioner that he would have to agree to the appeal waiver to enter his plea. (Tr. 73:2-7).

Atty. Kaufman was present when the Petitioner entered his plea. (Tr. 73:8-9).  He stated the Petitioner was lucid and appeared to understand the questions he was asked by the Court. (Tr. 73:11-17).  Atty. Kaufman testified that he would have told the Court if he believed the

Petitioner did not understand any of the questions he was being asked. (Tr. 73:16-17).   Atty. Kaufman stated that during the time between the plea and the date of his sentencing the Petitioner never expressed any dissatisfaction with the facts in the Plea Agreement or any grounds for appeal. (Tr. 73:18-22).

Atty. Kaufman was also present at the Petitioner's sentencing. (Tr. 73:23-74:3).   He was present when the Court informed the Petitioner he was waiving his appeal. (Tr. 73:23-74:3).   The Petitioner never expressed a desire to Atty. Kaufman that he wanted to appeal his sentence. (Tr. 74:4-6).

Atty. Kaufman stated that he believed the Petitioner was qualified to receive safety valve consideration because of the mandatory minimum sentence requirements imposed in this instance. (Tr. 74:17-25).   After negotiations with AUSA Malloy, the government finally agreed to offer the Petitioner the safety valve provision. (Tr. 75:1-10).   He met with the Petitioner to discuss a proffer that could be presented to AUSA Malloy regarding the safety valve. (Tr. 75:11-13).   In that proffer, the Petitioner and Atty. Kaufman cited all of the facts of the criminal charges. (Tr. 75:13-14). He stated that the Petitioner was pleased with the opportunity to receive the safety valve because it meant a pretty good reduction in his sentence. (Tr.75:15-17).   He told the Petitioner at the sentencing if everything went as planned and he got the safety valve, there would be no issue to appeal. (Tr. 75:18-25).

At the conclusion of the sentencing, the Petitioner and Atty. Kaufman spoke for a moment about his right to appeal and the Petitioner agreed that he did not have anything to appeal. (Tr. 76:1-8).   Atty. Kaufman wrote out a form (Gov't. Ex 1) and had the Petitioner sign the form. (Tr. 76:8-10). The form simply said "I do not wish to appeal my sentence."   The form

was signed by the Petitioner immediately after the sentencing and dated May 24, 2012, the same date as the Petitioner was sentenced. (Tr. 76:11-15).

Atty. Kaufman stated that he did not often have a client sign such a form, but did so here because he was happy for the Petitioner since he received the safety valve and there was nothing to appeal.   (Tr. 77:1-7).  Generally, Atty. Kaufman would send the client a detailed letter, explaining all of his post sentences issues and rights but in this case he was so happy for him he did not think there would ever be an issue. (Tr. 77:1-7).   Atty. Kaufman said between the time of the Petitioner's sentencing and the time he filed the instant § 2255 Motion, he never heard from the Petitioner. (Tr. 77:19-23).   In fact, Atty. Kaufman said that he never, at any time, received any indications from the Petitioner that he wanted to file an appeal in his case. (Tr. 77:24-78:2).

On cross examination, Atty. Kaufman stated that he had clients file § 2255 motions before the instant Motion but was only aware of four or five. (Tr. 80:14-18).   He did note, however, that the instant case was the first time he had ever been called to testify in a § 2255 hearing. (Tr. 80:18-20).

## DISCUSSION

There are four grounds for attacking a sentence pursuant to 28 U.S.C. § 2255: first, if it was imposed in violation of the Constitution or laws of the United States; second, if it was imposed without jurisdiction; third, if it was imposed in excess of the maximum authorized by law; and finally, if it is otherwise subject to collateral attack.  U.S. v. Walker, 198 F.3d 811, 813 n. 5 (11th Cir. 1999).  Ineffective assistance of counsel is a cognizable claim under the terms of the statute.

In this instance, the Petitioner challenges his plea on two grounds.  First, the Petitioner argues the plea was taken in violation of the standards recognized by the United States Supreme

Court in <u>Padilla v. Kentucky</u>, ----U.S.----, 130 S. Ct. 1473, 176, L. Ed. 2d 284 (2010).  Second, the Petitioner argues ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution for failing to file an appeal.  The Respondent states the plea did not violate <u>Padilla</u>, and that Atty. Kaufman's assistance did not violate the Sixth Amendment.

The testimony presented at the hearing by the Petitioner Cossio and Atty. Kaufman, his counsel, during the plea and sentencing process, have marked differences related to the Petitioner's plea.  Therefore, the Court must first perform a credibility analysis of the testimony before proceeding to its analysis of the facts and testimony in this case.

*Credibility Analysis*

When weighing the credibility of witnesses the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing.  <u>U.S. v. Ramirez-Chilel</u>, 289 F.3d 744, 749-50 (11th Cir. 2002).

After hearing the testimony of the Petitioner and Atty. Kaufman, the Court finds Atty. Kaufman's testimony to be more credible. While on the stand, Atty. Kaufman's demeanor was forthright and calm.  Atty. Kaufman prepared notes from his files involving his representation of the Petitioner and came well prepared to present his testimony.  In contrast, the Petitioner was evasive with his answers and his demeanor edgy and somewhat defensive.  The Petitioner's Counsel for this hearing essentially testified for him by asking leading questions throughout Petitioner's direct examination and the Petitioner mostly just agreed with whatever Counsel stated.  During cross examination, the Petitioner was evasive and consistently replied that he did not understand the questions or what the Government's attorney was asking, even though the Petitioner testified that he understood English and had been educated in the United States.

The Petitioner's testimony was also inconsistent with his prior statements at the plea hearing.  In the instant hearing when questioned about his plea and any defenses he had to the charges against him he said he did not do any of the things charged against him.

Mr. Molloy:  Mr. Cossio, I understand that you just said that you committed the crime that you pled guilty to.

Petitioner:   Yes.

Mr. Molloy:  I'll ask you one more time. Before the plea, did you ever say anything to Mr. Kaufman about possible defenses to the crime?

Petitioner:   See, I'm having a hard time trying to understand did I ever ask Mr. Kaufman if I had possible defenses.

Mr. Molloy:  I'll rephrase the question. Prior to your plea of guilty, did you feel that you had any defense to the crimes you were charged with?

Petitioner:   Yes. I told you.

Mr. Molloy:  What were they?

Petitioner:   I told you that I didn't do none of that stuff that is in there. So why was I being charged for it?

(Tr. 33:18-34-7).

At the plea hearing, Petitioner acknowledged that the Plea Agreement contained a factual summary of the facts of his case and that he agreed with the facts found in the Plea Agreement as read to him by the Magistrate Judge during his plea. (Tr. 38:9-17).  The Petitioner admitted that he initialed each of the ten (10) pages in Plea Agreements factual summary and that he told the Magistrate Judge at the hearing that he agreed with the facts in the Plea Agreement. (Tr. 38:9-17).  The Petitioner never told the Court during the plea hearing that he disagreed with any of the facts in the Plea Agreement. (Tr. 39:6-9).  However, he testified at this hearing that he really did

not understand the Plea Agreement or what the facts were or consequences of signing the plea. (Tr. 38:18-25; 39:6-9).

When questioned about the statements he agreed with at the plea hearing, the Petitioner further says he does not remember being sworn to tell the truth when he entered his plea before the Court. (Tr. 39:16-20).  Contrary to the Petitioner's testimony, minutes from the plea hearing clearly state that the Petitioner was sworn. (Doc. # 134).  The Report and Recommendation from the Magistrate Judge to the District Court recommending that the Petitioner's plea be accepted states the Petitioner was sworn under oath concerning each of the subjects mentioned in Rule 11 of the Federal Rules of Criminal Procedure.[3] (Doc. # 139).  The Petitioner's statement that he does not recall being sworn to tell the truth is a strong indication that he does not feel he needs to be truthful with the Court or that he did not have to tell the truth at the plea hearing.

The Petitioner testified that he had grounds for an appeal of his case. (Tr. 32:13-17; 34:15-19).  When questioned about what those grounds for his appeal were, the Petitioner stated that he did not understand the question. (Tr. 35:11-12).

The Petitioner also said that Atty. Kaufman just dropped off his Plea Agreement, asked him to sign it but never discussed the details in the Agreement. (Tr. 12:3-14).  However, under cross examination he stated that when Atty. Kaufman came to see him in Moore Haven they discussed the information in the Plea Agreement. (Tr. 40:21-25).  The Petitioner testified:

> Mr. Malloy: In that eight day period of time between the time that you signed the agreement and the time that you entered a plea, did you ever tell Mr. Kaufman that you were confused about the plea agreement?
>
> Petitioner: No.

---

[3] Fed. R. Crim. P. 11(1)(G) directs the Court to "inform the defendant of and determine that the defendant understands . . . the nature of each charge to which the defendant is pleading."

> Mr. Malloy:  Did you ever tell Mr. Kaufman that you disagreed with any of the facts that were in the plea agreement?
>
> Petitioner: No. I believe we talk about that before that. That's -- if it's the same thing that he brought, told me--brought it over [to] Moore Haven and talked to me about it, I believe I did talk to him about some stuff that I didn't like, but he told me that there was nothing we can do. He can't change nothing on the papers, he told me.

(Tr. 40:14-25).

Further, when considering who has the greatest interest in the outcome of the hearing, it is clear the Petitioner would have the most to gain.  The Petitioner has his freedom and the length of sentence at stake.  While Atty. Kaufman might have his reputation as a defense attorney on the line, he would gain nothing by being less than candid with the Court.  In fact, being an officer of the Court Atty. Kaufman would have more to lose by being less than forthright with his testimony than the Petitioner, given the sanctions the Court can impose upon an attorney should he be found to be deceitful to the Court.

Thus, after observing the demeanor of the witnesses, hearing the testimony, and weighing the factors in the Eleventh Circuit's credibility standard, the Court finds that the testimony of Atty. Kaufman was the more credible.

<i><u>Whether Petitioner's Counsel was Ineffective</u></i>

The Petitioner alleges that he was denied effective assistance of counsel in violation of the Sixth Amendment on three (3) grounds.  In his First Amended Petition, the Petitioner claims defense counsel did not inform him he would be deported back to Mexico under 8 U.S.C. § 1227 after he finished his sentence as required by the Supreme Court's decision in <u>Padilla v. Kentucky</u>. Additionally, in his amended Petition, the Petitioner claims Atty. Kaufman failed to cover the Plea Agreement's provisions or the consequences that result from entering into the

Agreement.   In his original Petition, he states he received ineffective assistance of counsel because Atty. Kaufman failed to file an appeal after he was sentenced.

It is well settled that the Supreme Court's ruling in <u>Strickland v. Washington</u>, is the controlling legal standard for determining ineffective assistance of counsel claims. <u>Haliburton</u>, 342 F.3d at 1242. <u>Strickland</u> established a two-pronged standard to determine whether or not counsel's assistance was ineffective.  466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 674 (1984). First, the defendant must show that counsel's performance was so deficient that he was not performing as the "counsel" guaranteed by the Sixth Amendment. <u>Id.</u>  Second, the defendant must show that counsel's ineffective assistance prejudiced the defense to such a degree that the defendant was deprived of the right to a fair trial. <u>Id.</u>  The defendant must satisfy both prongs to prove ineffective assistance of counsel. <u>Id.</u>

<u>*(1)Whether Counsel Violated* Padilla v. Kentucky</u>

The Petitioner argues that since his immigration status and potential deportation pursuant to 8 U.S.C. § 1227 was not discussed with him during his plea, the plea violated the standard established by <u>Padilla</u> for effective assistance of counsel for an illegal alien in the United States. In <u>Padilla</u>, the United States Supreme Court held:

> In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel. The severity of deportation—"the equivalent of banishment or exile," <u>Delgadillo v. Carmichael</u>, 332 U.S. 388, 390–391, 68 S. Ct. 10, 92 L. Ed. 17 (1947)—only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation.

> It is our responsibility under the Constitution to ensure that no criminal defendant—whether a citizen or not—is left to the "mercies of incompetent counsel." To satisfy this responsibility, we now hold that counsel must inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.

Padilla, 130 S. Ct. at 1486-87 (internal citations omitted).  The Petitioner testified that Atty.

Kaufman never informed him that he would be deported for selling drugs after his sentence was

finished.

       The Petitioner pled guilty to five (5) counts of selling cocaine on February 8, 2010.  The

undersigned Magistrate Judge issued a Report and Recommendation (R & R) (Doc. # 139)

recommending that the guilty plea be accepted on February 8, 2010.  The District Court accepted

the plea (Doc. # 140) on February 9, 2010.  Given the date the plea was entered, and the date the

plea was accepted by the District Court, the standard established in Padilla was not decided until

March 31, 2010, approximately seven (7) weeks after the Petitioner pled guilty and his plea was

accepted.

       The Courts in the Middle District of Florida – to date – have not applied Padilla

retroactively.  U.S. v. Aguila 2012 WL 380054 *3 (M.D. Fla. February 6, 2012) (holding that

Padilla did not apply retroactively to an ineffective assistance claim) (citing U.S. v. Campbell,

778 F.2d 764, 768–69 (11th Cir. 1985)), *abrogated on other grounds,* Padilla, 130 S. Ct. 1473,

1476- L.Ed.2d 284 (2010). One circuit court of appeals has found Padilla to be retroactive,

United States v. Orocio, 645 F.3d 630 (3d Cir. 2011), and three have found it not to be

retroactive, United States v. Hernandez–Monreal, 404 F. App'x 714, 715 n. * 4 (4th Cir.2010);

United States v. Chang Hong, No. 10–6294, ——— F.3d ——, 2011 WL 3805763 (10th Cir. Aug.

30, 2011); Chaidez v. United States, 655 F.3d 684 (7th Cir. 2011); Aguila 2012 WL 380054 at

*3.  This Court agrees with the Fourth, Seventh, and Tenth Circuits, and the Aguila Court, that

Padilla created a new legal right that is not retroactive.  Id.  Regarding the application of Padilla

to an ineffective assistance claim that occurred prior to the Padilla decision, the Aquila Court

held "[i]t is clear that at the time of the guilty plea, it was not ineffective assistance for an

attorney not to inform a client of the deportation consequences of his guilty plea. Id. (holding that Padilla did not apply retroactively to an ineffective assistance claim).   Since Padilla was decided almost two (2) months after the Petitioner entered his guilty plea and has not been applied retroactively in this Court, it is respectfully recommended that Atty. Kaufman's representation was not ineffective in violation of the Sixth Amendment.

While the Court respectfully recommends Padilla does not apply given the time frames in this case, it should be noted that Atty. Kaufman did discuss the possibility that the Petitioner could be deported if he pled guilty to the felony drug charges filed against him. (Tr. 68:13-18). Regarding the deportation consequences of the plea, Atty. Kaufman stated that the Petitioner informed him that he was in the United States legally and that he had a green card. (Tr. 71:24-72:1). He explained again how he came to live in the United States with his parents when he was eleven (11) years old. (Tr. 22:25-23:5; 71:24-72:1).   Atty. Kaufman told the Petitioner that he had a deportation detainer against him and that there was the possibility he could be deported. (Tr. 102:7-10).  He said "I can't tell you you will, I can't tell you you won't. But you do have a detainer and it's a possibility." (Tr. 72:4-6).

Based upon the evidence presented at the hearing and the Parties memoranda of law, the Court respectfully recommends that Atty. Kaufman did not violate the standards for effective counsel regarding the immigration issue as the Padilla case was decided after the Petitioner's plea.

### (2) Whether Atty. Kaufman Discussed the Plea Agreement with Petitioner

The Petitioner alleges that Attorney Kaufman never covered the Plea Agreement with him nor explained any of its provisions or consequences.   The Petitioner states that he was

confused by the terms of the Plea Agreement and confused by what he read. (Tr. 12:3-14; 38:18-25; 39:6-9).

In contrast to the Petitioner's testimony, Atty. Kaufman testified the Petitioner may not have understood all of the provisions in the Plea Agreement when he first started reviewing it with him but after reviewing it with him, he "absolutely understood every provision because he spent a lot of time with him." (Tr. 66:14-18).  Further, in the eight (8) day period of time between the time he signed the Plea Agreement and the time he entered a plea, Petitioner never informed Atty. Kaufman that he was confused about the Plea Agreement. (Tr. 41:10-22).

Atty. Kaufman testified that he discussed the Plea Agreement with the Petitioner and went over the provisions contained in the Plea Agreement in detail. (Tr. 66:4-5).  A review of the record shows that the Petitioner reviewed and initialed each and every page of the Plea Agreement (USA v. Cossio, 09-cr-90-JES-SPC, Doc. #128) and that he and Atty. Kaufman both signed the Plea Agreement. (Tr. 36:8-9; 37:18-20). The fact that each page was initialed by the Petitioner and signed by both the Petitioner and Atty. Kaufman is a strong indicator that the Petitioner and Atty. Kaufman reviewed the Plea Agreement together.

Based upon the Court's credibility analysis, the Court finds that Atty. Kaufman's testimony regarding discussions involving the Plea Agreement is the more credible and thus recommends that Atty. Kaufman did in fact cover the Plea Agreement as well as the resulting consequences of the plea with the Petitioner.

### (3) Whether Atty. Kaufman Failed to File the Petitioner's Appeal

The Petitioner alleges that his Sixth Amendment right to effective assistance of counsel was violated because Atty. Kaufman did not file an appeal. In a criminal case, a defendant's notice of appeal must be filed in the district court within ten (10) days after the later of the entry

of either the judgment or the order being appealed.  Fed. R. App. P. 4(b)(1).  It is a well-settled principle that an attorney who fails to file an appeal on behalf of a client who specifically requests it acts in a professionally unreasonable manner *per se*.  Gomez-Diaz v. U.S., 433 F.3d 788, 791-792 (11th Cir. 2005).  Even if a client has not made a specific request of his attorney to file an appeal, a court must inquire whether the attorney consulted with the client regarding the advantages and disadvantages of appealing and made a reasonable effort to determine the client's wishes.  Id. at 792.

The Petitioner testified that he wanted to appeal his sentence and it was his understanding that Atty. Kaufman was going to file an appeal of his sentence. (Tr. 20:20-21:2; 21:22-24).  He states that to this day, he has not received any information on the status of his appeal or whether any such appeal has been file. (Doc. # 1. p. 2, ¶ 9).  Atty. Kaufman has not provided him with a date for filing the appeal nor a copy of an appeal. (Doc. # 1. p. 2, ¶ 9).

The Petitioner testified after he was told about the immigration issues and that his wife would also be prosecuted, which he claims was not supposed to happen if he pled guilty, that he wanted to appeal his sentence. (Tr. 19:19-20:2).  He stated that he told Atty. Kaufman at the end of his sentencing that he wanted to appeal. (Tr. 20:20-21:2).  Atty. Kaufman had him sign a blank piece of paper which the Petitioner testified that he thought was part of the appeal. (Tr. 21:5-7).  The Petitioner stated he was confused by the Plea Agreement and he felt he had good grounds to appeal based on the facts in the Plea Agreement. The Government argues the Petitioner informed Atty. Kaufman that he did not want to file an appeal.

Atty. Kaufman testified that he discussed the fact with the Petitioner that he would waive his rights to file an appeal by entering the Plea Agreement. (Tr. 72:16-19).  In fact, Atty. Kaufman stated that he spent a lot of time explaining to the Petitioner the fact that he would give

up his right to appeal. (Tr. 72:22-73:7).  He told the Petitioner that he would have to agree to the waiver to enter his plea. (Tr. 73:2-7).  Atty. Kaufman testified that he was careful to thoroughly explain what the waiver of the right to appeal meant to his clients because the right to appeal a sentence is such a valuable right. (Tr. 72:22-25).  Thus, it is clear the Petitioner was informed that by entering a plea of guilty he was giving up his right to appeal his sentence.

Atty. Kaufman further testified that he told the Petitioner at the end of the sentencing that there was nothing to appeal because he had received the safety valve reduction in his sentence. (Tr. 75:18-25)  Atty. Kaufman testified that he had the Petitioner sign the paper which read "I do not wish to appeal my sentence" because there was nothing left for the Petitioner to appeal. (Tr. 76:1-10); (Govt. Ex. 1).  The paper was dated May 24, 2012, the date of the sentencing, and signed by the Petitioner. (Tr. 76:11-15).  Atty. Kaufman said that it is not his normal procedure to have a client sign such a document but did so in this instance because he was happy for the Petitioner since he received the safety valve provision reducing the length of his sentence. (Tr. 77:17).  As such, there was nothing left to appeal.

The Petitioner claims that he was confused about the purpose of the blank sheet of paper and that he did not understand the legal process, however, he also testified that he was capable of reading a law book, discovering and understanding the concept behind a § 2255 petition, and then able to file a Petition without any assistance.  The Petitioner went to school in the United States and it is clear from his testimony that he understands English and that he was capable of understanding that by signing the document stating that he would not appeal his sentence Atty. Kaufman would not file an appeal.

The Petitioner also argues that he had grounds for appeal based upon the facts presented in the Plea Agreement.  However, the Petitioner never contested the facts in the Plea Agreement.

Atty. Kaufman even informed the Petitioner if he did not agree with the facts in the Plea Agreement he needed to state why before his plea was entered because the Judge would not allow him to plead guilty if he did not agree with every detail. (Tr. 65:12-15). When he appeared before the Magistrate Judge and was asked if he agreed with the facts in the Plea Agreement the Petitioner told the Judge that he agreed. (Tr. 39:1-10). Thus, the Petitioners argument that he wanted to appeal his sentence based upon erroneous facts contained in the Plea Agreement lacks merit.

The Court also recognizes that it was approximately six (6) months after he was sentenced that the Petitioner even inquired about an appeal. (Tr. 42:23-43:3). Furthermore, it is simply not plausible that Atty. Kaufman would have the Petitioner sign a blank piece of paper just in case he needed to cover himself at some point in the future. Thus, after reviewing the testimony and performing a credibility analysis that determined Atty. Kaufman's testimony was more credible than the Petitioners, this Court believes that Atty. Kaufman gave the Petitioner a document that contained the phrase "I do not want to appeal my sentence" which Petitioner signed after his sentencing. (Tr. 76:1-10); (Govt. Ex. 1). Thus, the Court respectfully recommends that the Petitioner did not ask Atty. Kaufman to file an appeal on his behalf nor did Atty. Kaufman err by not filing such an appeal.

As such, the undersigned respectfully recommends that the Petitioner's Sixth Amendment right to effective assistance of counsel was not violated by Atty. Kaufman's representation, because the Petitioner did not request an appeal to be filed on his behalf but signed the paper informing his attorney that he did not wish to file an appeal.

## CONCLUSION

Based on the testimony and evidence presented at the hearing pursuant to the Petitioner's Petition, the Court respectfully recommends that Atty. Kaufman provided effective assistance of counsel. Thus, the Court respectfully recommends that the Petition to Vacate, Set Aside, or Correct Sentence should be denied.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Petitioner, Francisco Cossio's Amended Petition Under 28 U.S.C. § 2255 (Doc. #24) should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this __4th__ day of October, 2012.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All Parties of Record